UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

OTIS STONE,                                          :
                                                     :
                              Plaintiff,             :
                                                     :     MEMORANDUM &
             -against-                               :        ORDER
                                                     :     11-CV-3932 (SMG)
THE PORT AUTHORITY OF NEW YORK AND NEW               :
JERSEY, POLICE CHIEF JOHN RYAN, in his               :
individual and official capacity, OFFICER SCOTT      :
SEAMON, in his individual and official capacity,     :
OFFICER JOHN TUCCI, in his individual and official   :
capacity, OFFICER JOHN CURNYN, in his individual     :
and official capacity,                               :
                                                     :
                              Defendants.            :
-------------------------------------------------------------------- x

GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

Plaintiff Otis Stone owned and operated a restaurant at John F. Kennedy International Airport ("JFK") called Chef's Orchid. Plaintiff leased the restaurant's location from Japan Airlines. Chef's Orchid did not have a permanent liquor license. On November 8, 2010, a fire ignited in a mechanical room adjacent to the restaurant. When Port Authority personnel responded to the scene, they found boxes of liquor being stored illegally. They then searched the restaurant and performed a fire inspection, through which they identified a number of Fire Code violations. Mr. Stone was told not to leave. He was eventually escorted to the police station, but not handcuffed, and issued three summonses. His restaurant was closed until the code violations were remedied. The summonses resulted in Adjournments in Contemplation of Dismissal and a civil penalty paid to the New York State Liquor Authority.

Plaintiff now brings this action pursuant to 42 U.S.C. § 1983 against the Port Authority of New York and New Jersey ("Port Authority") as well as the police officers who responded to the scene: Police Chief John Ryan, Officer Scott Seamon, Officer John Tucci, and Officer John Curnyn, all of whom are sued in their individual and official capacities.  Second Amended Complaint  ("2d Am. Compl."), Docket Entry 32.  In the ten causes of action he asserts, plaintiff alleges that he was subjected to unlawful search and seizure, assault and battery, excessive force, false arrest, false imprisonment, malicious prosecution, racial discrimination, tortious interference with prospective economic advantage, violation of his constitutional and state law rights, and denial of his right to due process.  He also alleges that the Port Authority was negligent in failing to train and supervise its employees.  *See* 2d Am. Compl.

Defendants have moved for summary judgment.  Docket Entry 37.  The case has been reassigned to me for all purposes with the consent of the parties.  Docket Entry 28.  For the reasons stated below, defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The parties have submitted statements of material facts but have failed to comply with the requirements of Local Civil Rule 56.1.  *See* Defs. R. 56.1, Docket Entry 38; Pl. R. 56.1, Docket Entry 48.  Local Rule 56.1(a) requires a party moving for summary judgment to provide "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Defendants have done so.  Defs. R. 56.1, Docket Entry 38.  The rule further requires the party opposing summary judgment to submit papers that "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to

which it is contended that there exists a genuine issue to be tried." Local Civil Rule 56.1(b). Plaintiff has submitted a counter-statement of material facts. Docket Entry 48. However, plaintiff's counter-statement does not include paragraphs numbered to correspond to the paragraphs in defendants' statement and does not respond to the factual allegations defendants make in their statement. Defendants have similarly failed to submit a proper response to plaintiff's counter-statement of material facts.

This Court may consider any facts not properly controverted as admitted. Local Civil Rule 56.1(c). Instead, however, I review the evidentiary support cited by the parties in their respective statements of material facts and, unless otherwise noted, rely only on those facts that are properly supported and not rebutted with citations to contradictory evidence presented in a form that would be admissible at trial. *See* Fed. R. Civ. P. 56(c).

From 1998 to 2011, Plaintiff Otis Stone operated a cafeteria called Chef's Orchid in Building 14 at JFK in Jamaica, New York. Defs. R. 56.1 ¶ 13; Defs. Ex. H, Deposition of Plaintiff Otis Stone ("Stone Dep."), Docket Entry 39-8, at 14-15, 21. Stone contracted to operate the cafeteria with Japan Airlines, Inc. ("JAL"), which in turn leased the building from the Port Authority of New York and New Jersey ("Port Authority"). Defs. R. 56.1 ¶¶ 13-14; Stone Dep. at 21-22.[1] On November 8, 2010, a fire broke out in a mechanical room adjacent to Chef's Orchid and occasionally used by Stone for storage. Defs. Ex. F, Deposition of John Ryan ("Ryan Dep."), Docket Entry 39-6, at 61-62; Defs. Ex. G, Deposition of Scott Seamon ("Seamon Dep."), Docket Entry 39-7, at 47-57; Affidavit of Otis Stone ("Pl. Aff."), Docket Entry 51-2, at ¶ 2. The Fire Department of New York responded to the scene, as did a number of officers

---

[1] The Port Authority is a bi-state agency, created by compact between New York and New Jersey, which operates JFK Airport pursuant to a lease agreement with the City of New York. Defs. R. 56.1 ¶¶ 1-3.

employed by the Port Authority, and the building was evacuated. *See* Stone Dep. at 41-42; Seamon Dep. at 56, 107; Ryan Dep. at 62.

Defendants Ryan, Seamon, Tucci, and Curnyn, each employed by the Port Authority, were among those who responded to the fire on November 8, 2010. Ryan Dep. at 11, 57; Seamon Dep. at 14, 18, 56; Defs. Ex. E, Deposition of John Curnyn ("Curnyn Dep."), Docket Entry 39-5, at 10, 26; Defs. Ex. I, Deposition of John Tucci ("Tucci Dep."), Docket Entry 39-9, at 12-13, 28-29. At that time, Ryan was a Police Lieutenant assigned to the JFK command for emergency security and equipment; Seamon was a Police Officer and Fire Marshal at the JFK command; Tucci was a Police Investigator in the Office of the Inspector General ("OIG") with an office at JFK; and Curnyn was a Police Detective assigned to OIG who also held an office at JFK. *Id.*[2]

Although Stone was not present when the fire started, he arrived at the restaurant after it was extinguished. Stone Dep. at 35, 39-40. According to Stone, after he arrived, Ryan told him that he could not go inside the restaurant at that time, and that he was not free to leave. Pl. R. 56.1 ¶ 3; Stone Dep. at 61; Pl. Aff. ¶ 6.[3] Ryan asked for written consent to search the nonpublic areas of plaintiff's business, including the office and conference room, which plaintiff asserts he declined to provide. Pl. Aff. ¶¶ 9-10. Nonetheless, Seamon and Ryan conducted a walk-through fire inspection of the entire restaurant premises. Seamon Dep. at 110 ("I did an entire inspection of the entire tenant space including the office . . . . [A]nytime after a fire occurs, I do a full building inspection of the premise."), 117 (Seamon indicating that Ryan accompanied him through the inspection of the premises).

---

[2] Policing the Port Authority are the Port Authority's Public Safety Department ("PSD"), which employs police officers, and its Office of Inspector General ("OIG"), which also receives and investigates complaints of wrongdoing, fraud, waste, and abuse related to the Port Authority, its employees, officers, and those with whom it does business. Defs. R. 56.1 ¶¶ 4-5.

[3] It appears from the context of Stone's deposition testimony that the building had been evacuated at the time Ryan told Stone he could not go inside the restaurant. Stone Dep. 63.

Upon his arrival, Seamon learned from a fellow officer that the fire started in a mechanical room and had already been extinguished. Seamon Dep. at 107. Seamon went to the mechanical room, where he observed smoke in the area. *Id.* at 108. Seamon also discovered combustible materials in the mechanical room, including wine, beer and lighter fluid, as well as files in the adjoining corridor and additional New York City Fire Code ("NYCFC" or "Fire Code") violations in the electrical room. Seamon Dep. at 124-25, 142, 263. At his deposition, Seamon stated that he learned from Japan Airlines personnel that plaintiff was using the mechanical room space. Seamon Dep. at 53-54, 134-35. Seamon further testified that Stone himself acknowledged to Seamon that the combustible material stored in the mechanical room belonged to him. Seamon Dep. at 53-54, 134-35. After observing the combustible material in the mechanical room, Officer Seamon issued a summons charging plaintiff with violating the Fire Code. Seamon Dep. at 31-32, 47; Defs. Ex. V. Other than to claim that the mechanical room was the responsibility of Japan Airlines, Pl. Aff. ¶ 24, plaintiff did not offer any testimony in his deposition or in his affidavit in opposition to summary judgment contrary to Seamon's on this point.

After he arrived on the day of the fire, Officer Curnyn learned from other officers that plaintiff did not have a liquor license for Chef's Orchid. Curnyn Dep. at 21-22. Curnyn observed liquor being stored there, though, and also saw a bar where it "appeared liquor was for sale." Curnyn Dep. at 24. After making these observations, Curnyn called the Queens County District Attorney's Office, described what he had seen, and was authorized to make an arrest or issue a summons. Curnyn Dep. at 25. Curnyn then brought plaintiff to the police station and issued two tickets to him charging liquor law violations. Curnyn Dep. at 41; Defs. Ex. U. Stone acknowledged during his deposition that, on November 8, 2010, Chef's Orchid did not have a

liquor license, Stone Dep. at 130, and he did not deny that there was alcohol on the premises on the day of the fire. To the contrary, at his deposition, Stone challenged only the number of bottles of alcohol reported by the officers, and seems to have acknowledged in his counter-statement of material facts that he stored liquor at Chef's Orchid. Stone Dep. at 131, Pl. R. 56.1 ¶ 41. Stone also admitted in a written statement made on the day of the fire that he was storing alcohol at Chef's Orchid for use in another restaurant, Clippers II. Defs. Ex. T.

The summonses issued to plaintiff by defendants Seamon and Curnyn were eventually resolved after court proceedings, with an Assistant District Attorney and counsel for Stone present, at which Stone accepted Adjournments in Contemplation of Dismissal ("ACDs"). Defs. R. 56.1 ¶¶ 26-27; Defs. Exs. W, X. Plaintiff also agreed to pay a $10,000 civil penalty to the New York State Liquor Authority. Defs. Ex. Y.

The inspection conducted by Seamon and Ryan included nonpublic as well as public areas of the cafeteria. Stone claims the defendants searched his closed office, a locked conference room, and a number of cabinets throughout the restaurant that were either closed or locked. According to Stone, defendants broke open locks to gain access to areas that were secured. Pl. Aff. ¶¶ 12-15; Pl. R. 56.1 ¶ 6. In addition to finding liquor in the mechanical room, defendants located alcoholic beverages in cabinets throughout the restaurant and in an area, set up as a bar, which contained alcohol and beer as well as a displayed price list. Seamon Dep. at 142-43; Pl. Aff. ¶¶ 12-14; Defs. R. 56.1 ¶ 21; Defs. Ex. S.[4]

---

[4] The room Stone refers to as his "conference room" appears to be the same location that defendants call the "bar" area. In his affidavit, Stone alleges that liquor was located in "locked cabinets at the bottom of a serving area, in the back of the conference room." Pl. Aff. ¶ 14. He also articulates, "My conference room was locked by me . . . and I was the only one with a key. Defendant Ryan ordered the door to my locked conference room be broken into." Pl. Aff. ¶¶15-17. This parallels Tucci's testimony when he describes "the bar area, the party room", to which "SLA was called to gain us entry" when Stone could not locate the key. Tucci Dep. at 69-70; *see also* Seamon Dep. at 142 (stating "in the conference room or bar room" to refer to both interchangeably).

Because of the Fire Code violations he found, including a failure to properly maintain the kitchen ventilation system, Seamon told Stone his restaurant had to remain "closed to occupancy until all health and fire hazards have been resolved, inspected by the Fire Marshal, and authorization to occupy received by the PA Health Inspector and Lt. Ryan." Pl. Ex. C, Docket Entry 50, at 2 of 8. In the weeks following the fire, the restaurant was inspected by Seamon approximately six times. Seamon Dep. at 248. After an inspection on December 2, 2010, the restaurant was permitted to open under the supervision of a "fire watch." Seamon Dep. at 234.[5]

Stone alleges that the inspections and code violations they purportedly uncovered were pretexts to shut down his restaurant. Pl. Aff. ¶¶ 30-32; Pl. R. 56.1 ¶¶ 122-23. Stone further contends that the ventilation system in the Chef's Orchid kitchen was installed before the promulgation of the NYCFC and should have been exempt from certain code requirements. Pl. Ex. A, Report of Robert Malanga (plaintiff's fire safety and prevention expert), Docket Entry 49-2 ("Malanga Report"). Stone also claims that "the only violation that could be considered as presenting a potentially imminent hazard was that involving the need to clean the Ventilation System, which was *corrected the day after the Fire*; conversely, those remaining involved only documentary and general fire safety issues, or otherwise, nonapplicable equipment considerations, none of which presented any imminent hazard." Malanga Report at 19.

DISCUSSION

**Summary Judgment**

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[5] The NYCFC defines "fire watch" as "[a] temporary measure intended to ensure continuous and systematic surveillance of a building or portion thereof by one or more qualified individuals for the purposes of identifying and controlling fire hazards, detecting early signs of fire, raising an alarm of fire and notifying the department." New York City, N.Y., Code § 202.

R. Civ. P.  56(a).  An issue of fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Factual disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991).  "The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Perlman v. Fid. Brokerage Servs. LLC*, 932 F.Supp.2d 397, 406 (E.D.N.Y. 2013) (citing *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2004)).  The initial burden of establishing that there are no genuine issues of material fact falls on the moving party; if the movant meets that burden, the non-moving party must produce evidence of specific facts that raise a genuine issue for trial to avoid summary judgment.  *Anderson*, 477 U.S. at 256; *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996).  Mere conclusory allegations are insufficient, and "[t]here must be more than a 'scintilla of evidence'" to defeat a summary judgment motion.  *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252).

**Section 1983**

Plaintiff brings various federal constitutional claims pursuant to 42 U.S.C. § 1983.  2d Am. Compl. ¶ 60.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979).  To prevail on a claim under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the

conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."
*Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

Plaintiff brings suit against the defendant officers in both their individual and official capacities. "It is well-settled that to hold a defendant individually liable for a civil rights violation a plaintiff must plausibly allege some personal involvement in the constitutional violation." *McCaffrey v. Cnty. of Nassau*, 2013 WL 2322879, at *5 (E.D.N.Y. May 25, 2013) (referencing *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir. 2010)). A defendant may be held personally liable where he "(1) directly participated in the infraction, (2) failed to remedy the wrong after learning of the constitutional violation, (3) created the policy or custom under which the unconstitutional practice occurred or allowed such custom or policy to continue or, (4) was grossly negligent in managing subordinates who caused the unlawful event." *Id.* Liability may also arise where the official was grossly negligent or deliberately indifferent to constitutional rights. *Id.*

**First and Fifth Causes of Action: Excessive Force and Assault and Battery**

Stone claims in his first and fifth causes of action that he was subjected to excessive force and assault and battery in violation of his federal and state constitutional rights. 2d Am. Compl. ¶¶ 65, 90. Plaintiff alleges that he "had multiple assault and batteries committed to his person, and excessive force was used against Plaintiff, including but not limited to, being restrained and searched" by the individual defendants. 2d Am. Compl. ¶ 12.

Plaintiff's federal and state claims have similar requirements. "Federal excessive force claims and state law assault and battery claims against police officers are nearly identical." *Graham v. City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) (citing *Humphrey v. Landers,* 344 Fed. Appx. 686, 688 (2d Cir. 2009) (summary order)). In both, a plaintiff must

prove that the officer's use of force was excessive, or objectively unreasonable, under the facts and circumstances known to the officer. *Graham*, 928 F. Supp. 2d at 624; *see Pelayo v. Port Authority*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012). When evaluating excessive force claims, a court must balance the plaintiff's Fourth Amendment rights with the government interests at stake by considering: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010); *see Graham*, 928 F. Supp. 2d at 617-18. For force to be excessive, particularly when used in the context of making a lawful arrest, it must be "serious or harmful" and not "de minimis." *Drummond v. Castro,* 522 F. Supp. 2d 667, 678-79 (S.D.N.Y. 2007).

A successful New York state assault claim demonstrates that the defendant "placed the plaintiff in reasonable fear of imminent harmful or offensive bodily contact." *5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 201 (S.D.N.Y. 2010). A claim of battery requires proof of intentional offensive or wrongful physical contact without plaintiff's consent. *Id.*; *see Pelayo*, 893 F. Supp. 2d at 642; *see also Bastein v. Sotto,* 299 A.D.2d 432, 749 N.Y.S.2d 538, 539 (2002). Assault and battery under New York state law are "plaintiff friendly," *Graham*, 928 F. Supp. 2d at 624, because, "[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Id.*; *Sulkowska v. City of New York*, 129 F.Supp. 2d 274, 294 (S.D.N.Y. 2001) (internal citations omitted).

Although the wording of plaintiff's claims might suggest that he contends that the defendant officers used more force than was necessary to take him into custody, plaintiff's claim

is instead based upon his contention that the officers had no lawful basis to detain him at all: "Defendants . . . used excessive force *in that the arrests of Plaintiff were unlawful.*" Pl. Opp. at 22 (emphasis added). More specifically, plaintiff contends that

> Defendants used force on two occasions. The first is when Defendant Ryan pushed Plaintiff into a seat after Plaintiff refused to provide written consent to a search of his business. The second is when the Defendants made the Plaintiff go down to the station with them. Moreover, because the arrests were unlawful, they were by definition excessive and constitute an assault and battery.

Pl. Opp. at 23 (internal references to Pl. R. 56.1 ¶¶ 8, 15, 27, 80-81, 89 omitted).[6] While plaintiff alleges that Detective Ryan told him he "was not free to leave" and that he was taken "against [his] will via police car to the Port Authority police headquarters," Pl. Aff. ¶¶ 6 and 19, he does not contend that he was handcuffed or that defendants used more force than reasonably necessary to detain him and take him to the police precinct. Thus, to prevail on his excessive force and assault claims, plaintiff must establish that his detention and removal to the police station were unlawful.

An arrest is lawful if made pursuant to a warrant or based upon probable cause. "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested *has committed or is committing a crime.*" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis in original) (internal references omitted). The test for probable cause asks "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir. 2006). "Where an arrest is supported by

---

[6] Plaintiff does, as the excerpted quotation indicates, allege that Defendant Ryan pushed him into a chair. Pl. Opp. at 23. Read in the context of the entire memorandum, however, it seems plaintiff is challenging the officers' conduct only insofar as he claims he was detained without probable cause. Even if plaintiff contends that Ryan's push was an independent use of force, he does not claim any injury, pain, or even discomfort from the "push." I therefore find the alleged force used to be *de minimis* and insufficient to support an excessive force claim.

probable cause, an officer will not be liable under theories of assault and battery for the 'use [of] physical force when and to the extent she or he reasonably believes [it is] necessary to effect the arrest.'" *Ladoucier v. City of New York*, 2011 WL 2206735, at *6 (S.D.N.Y. June 6, 2011) (internal references omitted).

Plaintiff's arrest was lawful because defendants had probable cause to believe he had committed a crime by storing combustible material in a mechanical room. When the defendant officers arrived at the scene and proceeded to the source of the mechanical room fire, they found combustible material stored there in violation of the New York City Fire Code. The Fire Code provides, "Combustible material shall not be stored in boiler rooms, mechanical rooms or electrical equipment rooms." New York City, N.Y., Code § 315.2.3. Failure to comply with this section of the Fire Code is a violation:

> [a]ny person who shall violate or fail to comply with any laws, rules, or regulations enforceable by the department, unless a different penalty is specifically provided, shall be guilty of a violation and upon conviction thereof shall be punished by a fine of not more than five thousand dollars for each offense. Such person shall also be subject to the payment of a civil penalty of not more than five thousand dollars which may be recovered in a civil action brought in the name of the commissioner.

New York City, N.Y., Code § 15-216(a). Knowingly failing to comply with the section is a misdemeanor punishable "by a fine of not more than ten thousand dollars or imprisonment for not more than six months or both for each offense." New York City, N.Y., Code § 15-216(b). When defendant Seamon arrived at the scene of the fire, he observed boxes containing alcohol in the mechanical room. It was objectively reasonable for him to conclude that the incriminating alcohol belonged to Stone, who owned and operated a restaurant adjacent to the boiler room and had previously obtained temporary liquor licenses. Indeed, Stone admitted to Seamon that the

liquor was his.  Having observed evidence that Stone had violated section 315.2.3, Seamon had probable cause to arrest him for committing a misdemeanor offense.

Officer Curnyn also had probable cause to arrest plaintiff for committing a crime.  The summonses issued by defendant Curnyn charged Stone with violating sections 64-b and 96 of the New York Alcoholic Beverage Control Law ("ABC").  Section 64-b makes it unlawful to serve alcohol at a commercial premises with a capacity of more than twenty persons without a license.  Section 96 prohibits storing alcohol without a permit on any unlicensed premises.  Finally, section 130 of the ABC provides that it is a misdemeanor to sell alcoholic beverages at an unlicensed premises or to violate any other provision of the ABC that does not specify another penalty.  Curnyn observed a substantial amount of alcohol stored on the premises.  In addition, as noted above, Curnyn testified at his deposition that he learned from other officers that plaintiff did not have a liquor license for Chef's Orchid, Curnyn Dep. at 21-22, and plaintiff himself acknowledged during his deposition that Chef's Orchid did not have a liquor license on November 8, 2010.  Stone Dep. at 130.  Curnyn even contacted the Queens County District Attorney's Office and obtained authority to issue summonses to Stone or to arrest him.  Curnyn Dep. at 25.

Stone seems to argue that Curnyn lacked probable cause to charge him with violating state liquor laws because he did not have personal knowledge that Chef's Orchid did not have a liquor license.  Pl. Opp. at 7; Pl. R. 56.1 ¶ 19.  However, an arresting officer need not have personal knowledge of each fact giving rise to probable cause:

> Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.

*United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing *United States v. Hensley,* 469

U.S. 221, 230-33 (1985); *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir. 1972)).

This rule acknowledges the reality of modern police work that an arresting officer often cannot

know every fact relevant to a particular case and may reasonably rely on the knowledge of his or

her fellow officers for a fuller picture. *See id.* In this case, Stone had substantial amounts of

liquor on the premises of a restaurant that did not have a liquor license. Although Officer

Curnyn may not have had personal knowledge of each of these facts, he acted lawfully when he

relied on the knowledge of his supervisors and fellow officers to establish probable cause.

As discussed above, the existence of probable cause for plaintiff's arrest is fatal to his

claims of excessive force and assault and battery. Accordingly, summary judgment is granted

with respect to plaintiff's first and fifth causes of action.

**Sixth Cause of Action: Malicious Prosecution**

Plaintiff's sixth cause of action asserts a claim for malicious prosecution in violation of

plaintiff's state and federal constitutional rights. 2d Amend. Compl. ¶¶ 91-94. Plaintiff alleges

that defendants issued "several false and unsubstantiated summonses" that "were dismissed in

Court, and resolved in Plaintiff's favor." 2d Amend. Compl. ¶¶ 92-93. Plaintiff further contends

that he was prosecuted without probable cause and that "[e]ach Defendant initiated these

proceedings to teach Plaintiff a lesson, and at the instruction of Defendant Ryan. Indeed, the

record indicates that the officer apologized for issuing the tickets and stated that Defendant Ryan

was making them do it." Pl. Opp. at 24 (referencing Pl. R. 56. 1 ¶ 5).

Malicious prosecution under New York law requires a plaintiff to prove "(1) the initiation

or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in

plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice

as a motivation for defendant's actions." *Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks and citations omitted); *see Gannon v. City of New York*, 917 F. Supp. 2d 241, 244 (S.D.N.Y. 2013). Plaintiff's claim fails both because there was probable cause for commencing the proceedings against him and because the proceedings were not terminated in his favor.

Malicious prosecution requires an absence of probable cause to believe that the plaintiff could be "successfully prosecuted." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 417 (2d Cir. 1999); *see Boyd v. City of New York,* 336 F.3d 72, 78 (2d Cir. 2003); *Gannon*, 917 F. Supp. 2d at 244-45. Where there is probable cause to make an arrest (or issue a summons), "continuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014); *see also Gannon*, 917 F. Supp. 2d at 244. On the other hand, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact." *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). Thus, probable cause to arrest "is a defense to a claim of malicious prosecution if it is not later nullified by information establishing the [accused's] innocence." *Betts*, 751 F.3d 78 (summarizing the rationale articulated in *Kinzner*).

As discussed above in connection with plaintiff's first and fifth causes of action, defendants had ample probable cause for the summonses they issued to plaintiff on November 8, 2010. Plaintiff does not point to any information that surfaced later and nullified probable cause, and the record reveals none. Plaintiff's malicious prosecution claim fails for this reason alone.

Plaintiff's malicious prosecution claim also fails because the proceedings against him were not terminated in his favor. "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *see also Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 392 (S.D.N.Y. 2008). For this reason, acceptance of an adjournment in contemplation of dismissal ("ACD")[7] typically precludes a malicious prosecution claim; because an ACD specifically reserves judgment on guilt or innocence, courts have consistently held that an ACD does not constitute a termination in favor of the accused and therefore bars a malicious prosecution claim.

> Proceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty. An adjournment in contemplation of dismissal, like a consent decree, involves the consent of both the prosecution and the accused and leaves open the question of the accused's guilt.

*Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980) (internal citations omitted). *See also Green v. Mattingly*, 585 F.3d 97, 103 (2009) (citing cases); *Fulton*, 289 F.3d at 196 (finding that an ACD "is not a favorable termination because it leaves open the question of the accused's guilt, and allows the state to pursue the criminal prosecution in the interests of justice during the conditional period" (internal quotations omitted)); *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004); *Lozada v. City of New York*, 2013 WL 3934998, at *6 (E.D.N.Y. July 29, 2013); *Hollender v. Trump Vill. Co-op., Inc.*, 58 N.Y.2d 420, 426 (1983) (holding that "the adjournment

---

[7] An ACD is a conditional dismissal that becomes final from six months to one year after it is accepted, provided the court does not decide, on the prosecutor's motion, to restore the case to its calendar in the interest of justice. *Fulton*, 289 F.3d at 195. New York Law provides that an ACD "shall not be deemed to be a conviction or an admission of guilt. No person shall suffer any disability or forfeiture as a result of such an order. Upon the dismissal of the accusatory instrument pursuant this section, the arrest and prosecution shall be deemed a nullity and the defendant shall be restored, in contemplation of law, to the status he occupied before his arrest and prosecution." N.Y. Crim. Proc. Law § 170.55(8).

in contemplation of dismissal, being as unadjudicative of innocence as it was of guilt, by its very nature operated to bar recovery" for malicious prosecution).

For the reasons indicated above, plaintiff's malicious prosecution claim fails and summary judgment is granted for the defendants on plaintiff's sixth cause of action.

**Second Cause of Action: Illegal Search and Seizure**

Stone's second cause of action claims that defendants searched Chef's Orchid without a warrant, his consent, or other lawful authority in violation of his federal and state constitutional rights. Plaintiff alleges in his Second Amended Complaint that defendants unlawfully searched his "persons [sic] and property." 2d Am. Compl. ¶ 67. It is clear from plaintiff's submission in opposition to defendants' motion, though, that the gravamen of his complaint concerns defendants' search of his restaurant and, in particular, their search of a locked conference room and office and locked closets and cabinets. Pl. Opp. at 15.

The Fourth Amendment protects individuals from unreasonable searches and seizures. Generally, a seizure of property is considered "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the place to be searched, and the persons or things to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). To assert a violation of rights guaranteed by the Fourth Amendment, an individual "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

An individual may have a reasonable expectation of privacy in a commercial premise, though that expectation is "different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger,* 482 U.S. 691, 700 (1987); *see Minnesota*, 525 U.S.

at 88.  The Supreme Court has held that inspections of commercial premises by fire department officials are encompassed by the Fourth Amendment, and any inspection of non-public areas of business establishments requires a warrant:

> The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by warrant.

*See v. City of Seattle*, 387 U.S. 541, 543 (1967); *see also Michigan v. Tyler*, 436 U.S. 499, 509-10 (1978) (holding that fire inspectors may enter premises to fight a fire and ascertain its cause, but that any further investigation must be conducted pursuant to a warrant); *Camara v. Mun. Court of City & Cnty. of San Francisco*, 387 U.S. 523, 540 (1967) (requiring a search warrant to conduct a municipal health inspection when the homeowner refused consent and "[t]here was no emergency demanding immediate access").

Because the "Fourth Amendment's ultimate touchstone is 'reasonableness,'" there are a number of exceptions to the warrant requirement.  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  For example, exigent circumstances permit warrantless search and seizure.  One exigency that is a recognized exception to the warrant requirement is relevant here: the Supreme Court has explicitly held that fire officials may enter without a warrant to extinguish a fire, and once inside may investigate to determine the fire's cause:

> A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry "reasonable."  Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze . . . .  Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their

subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional.

*Michigan v. Tyler*, 436 U.S. at 509-10; *see also Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 236-37 (E.D.N.Y. 2010) *on reconsideration in part*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011).  The plain view doctrine, another exception to the warrant requirement, permits warrantless seizure of evidence if (1) an officer did not violate the Fourth Amendment in arriving at the place from which the evidence was plainly viewed, (2) the evidence is in plain view, and (3) the incriminating character of the evidence is immediately apparent.  *Horton v. California*, 496 U.S. 128, 136-37 (1990).  Any search which results in seizure of evidence in plain view, however, must be "strictly circumscribed by the exigencies which justify its initiation."  *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968) (cited in *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).

In this case, fire department officers responded to "a report of a fuel burner/boiler malfunction," "found a small fire in the boiler room extinguished prior to [their] arrival," and "shut down gas and electrical supplies."  Defs. Ex. Q, Docket Entry 62-4, at 4.  Clearly, under these circumstances, the officers' entry onto the premises and their examination of the boiler room was reasonable and consistent with *Michigan v. Tyler*.  436 U.S. 499.  Once in the boiler room, the officers observed combustible materials stored there in violation of the Fire Code, and they therefore acted lawfully in seizing that evidence.  Similarly, the officers did not infringe on Stone's constitutional rights when they walked through the public areas of the restaurant, because Stone had no reasonable expectation of privacy in spaces open to the public.  *See, e.g.*, *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).  Therefore, Stone's Fourth Amendment rights were not violated when the officers entered the mechanical room and observed and seized

the combustible material they found there, including the alcohol, or when defendants walked through the public areas of Chef's Orchid.

The officers were not, however, similarly justified in conducting a full inspection and searching the non-public areas of the restaurant, including Stone's office, locked conference room, and storage cabinets. Defendant Seamon concedes that, by the time these searches were conducted, the fire had been extinguished, its cause determined, and any exigency had dissipated. In response to the question "Is it safe to say that after the fire was extinguished with the fire extinguisher, there was no longer a fire threat at that location?," Seamon testified, "Yes." When asked if "the emergency was now over . . . ?", he again answered, "Yes." Seamon Dep. at 77-78. Seamon further testified that, after arriving at the mechanical room, he observed smoke, but also determined that the fire had been put out. Seamon Dep. at 108. Accordingly, when additional emergency response units started to respond, he "called off [via police radio] that the fire was extinguished." Seamon Dep. at 108. Nevertheless, according to plaintiff, Seamon and Ryan made a thorough search of Chef's Orchid, entering Stone's office and a locked conference room and opening closed cabinets, in some instances even breaking open locks securing them.

Because no exception to the warrant requirement applies to defendants' search of the cabinets, conference room and office, defendants' motion for summary judgment is denied with respect to this aspect of plaintiff's second cause of action.[8] It bears noting, though, that the survival of this aspect of plaintiff's second claim does not in any way affect my conclusion that plaintiff's arrest and prosecution were supported by probable cause. The summons issued by Seamon stemmed from plaintiff's storage of combustible material, including liquor, in the

_____

[8] In his deposition testimony, Stone alleges only that Ryan and Seamon were involved in the search. However, Curnyn and Tucci also admit to being present at the challenged search areas. Curnyn Dep. at 30; Tucci Dep. 68-70, 75-78. Because it appears that all of the named officers may have been involved in searching the contested areas of the restaurant, I make no distinction among them with respect to plaintiff's search and seizure claim.

mechanical room, and that fact came to light during a legal search.  Curnyn may well have issued

the state liquor law violations based upon the same evidence.  In any event, even if evidence

seized in violation of the Fourth Amendment contributed to the officers' probable cause

determinations, the "lack of probable cause to . . . search does not vitiate the probable cause to

arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to

assist a § 1983 claimant."  *Townes v. City of New York*, 176. F.3d 138, 149 (2d Cir. 1999).

Accordingly, those who have been subjected to unreasonable searches "cannot be compensated

for injuries that result from the discovery of incriminating evidence and consequent criminal

prosecution."  *Id*. at 148.  Here, then, as in *Townes*, Stone's "only possible damage claim would

be limited to the . . . invasion of privacy related to the seizure and initial search" of his office,

conference room and cabinets.  *Id*. at 149; *see Kennedy v. City of New York*, 2013 WL 3490351,

at *3-4 (E.D.N.Y. July 10, 2013).

For the reasons discussed above, defendants' motion for summary judgment is granted

with respect to the search of the mechanical room and public areas of the restaurant and denied

with respect to the search of the nonpublic areas of Chef's Orchid, including the office,

conference room, and cabinets.

**Third Cause of Action: Racial Discrimination**

Stone alleges in his third cause of action that defendant Ryan discriminated against him

and "targeted" him for adverse treatment because he is of African American descent.  2d. Am.

Compl. ¶ 71.  Plaintiff further alleges that Ryan discriminated against him by "selectively

harassing and threatening" him because of his national origin and by referring to his restaurant as

"the hood."  2d. Am. Compl. ¶¶ 71-74.

The United States Constitution prevents any state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. New York State's constitution also has an equal protection clause, which "is no broader in coverage than the Federal provision." *Hernandez v. Robles*, 7 N.Y.3d 338, 362 (2006). Essentially, the equal protection clause requires that "all persons similarly situated should be treated alike." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 336-37 (2d Cir. 2000) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985)). To succeed on a claim for equal protection on the basis of racial discrimination, a plaintiff must establish that a government actor intentionally discriminated against him on the basis of race. *Id.* at 337; *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).

Stone alleges that defendant Ryan harassed him on an ongoing basis for approximately two years, during which he was denied liquor licenses and otherwise scrutinized: "No other business owner at JFK airport was subject to the level of scrutiny that I was subjected to." Pl. Aff. ¶ 38. Plaintiff supports his allegations of harassment and elevated scrutiny with claims that Ryan told him over the phone, with plaintiff's friend as a witness, "'This is my airport. I do pretty much what I want to do around here,'" and that "Some way, somehow you are going to be out [sic] this airport." Stone Dep. at 195-96. Stone also describes a pattern of harassment by Ryan during which Stone was denied temporary permits to serve liquor, ostensibly for failing to produce security and fire plans, and that such plans had not been required of him before. Stone Dep. at 176-78. When Stone encountered a different Port Authority officer, that officer allegedly told Stone that there was no reason he should not be granted a temporary liquor license and, apparently referring to Ryan, that "'You know, this lieutenant is out of control.'" Stone Dep. at 179. Stone alleges the officer then provided his cell phone number and told Stone, "if this

lieutenant ever does anything like this to [Stone] again to give him a call, and he will handle it."
*Id.* Stone also argues that the Fire Code violations did not necessitate shutting down his
restaurant or issuing summonses to him, but that all of this was a result of Stone being targeted
by Ryan. Stone's equal protection claim alleges that Ryan implemented the liquor laws and the
Fire Code in a racially discriminatory manner by refusing him liquor licenses because of his race
and subjecting him to intense scrutiny.

Stone's evidence of racial or national origin animus, though, is lacking. While Stone
claims that Ryan treated him harshly, he has not offered any evidence that Ryan treated him any
differently from other similarly-situated business owners of different races or national origins.
Rather, the only evidence of race-based discriminatory intent mustered by Stone consists of two
comments he attributes to Ryan. Specifically, Stone claims that another unnamed police officer
told him that "Defendant Ryan referred to [Stone's] restaurant as the 'hood' and that [Ryan] said
that [Stone] make[s] too much black people food." Pl. Aff. at ¶ 39; *see* Pl. R. 56.1 at ¶¶ 109-110.
Even assuming these isolated statements would be sufficient to defeat summary judgment,
plaintiff has not identified the officer who reported them to him or provided an affidavit or other
sworn testimony from that officer. Thus, Stone's report of the unnamed officer's attribution of
statements to Ryan is hearsay, and would not be admissible in evidence at trial. Accordingly,
Stone has failed to raise a material question of fact with respect to whether Ryan was motivated
to harass him by discriminatory animus. *See* Fed. R. Civ. P. 56(c).

The close scrutiny to which plaintiff claims he was subjected is simply not enough,
standing alone, to raise an inference of discrimination. This is particularly so because plaintiff
operated a public establishment in an international airport, an environment that, by its nature, is
crowded and intensely regulated. Attention to public safety is a high priority. It is therefore

hardly surprising that, after a fire erupted, officers would be particularly attentive to conditions that might cause a future fire. Seamon's testimony is compelling in this regard:

> We had a fire condition, we had a building that evacuated, we had a fire department respond, we had all Port Authority emergency equipment respond . . . . [I]n this particular situation, what went on fire was a piece of cardboard that was behind a hot water heater that ignited. And if that . . . had a full ignition with the additional materials in that room, including . . . combustible Class A type of materials and the Class B flammable liquid materials that were in close proximity to the gas supply lines that were in that mechanical room, it could have been catastrophic.

Seamon Dep. at 56-57.

In short, there is a complete absence of admissible evidence that Ryan was motivated by racial bias in his treatment of Stone and his implementation of Port Authority policies. Accordingly, defendants' motion for summary judgment on plaintiff's third cause of action alleging discrimination is granted.

**Fourth Cause of Action: Tortious Interference with Prospective Economic Advantage/Harassment**

Plaintiff's fourth cause of action alleges that defendants interfered with his profitable business at JFK by negligently, willfully and unlawfully shutting it down. 2d Amend. Compl. ¶¶ 76-78. Plaintiff contends that the defendants used "false and unsubstantiated fire inspection reports" in order to sabotage his business and destroy his personal property. 2d Amend. Compl. ¶¶ 79-85. This claim is based upon plaintiff's contention that defendants wrongfully issued fire hazard reports that kept his business from operating for approximately twenty-five days following the fire. Pl. Opp. at 14.

Under New York law, a successful claim of tortious interference with prospective economic advantage must demonstrate:

> that defendant "interfered with business or economic relations between the plaintiff and a third party, either (1) with the *sole* purpose of harming the plaintiff;

or (2) by dishonest, unfair or improper means" . . . . "[T]he defendant must interfere with the business relationship directly; that is, the defendant must direct some activities toward the third party and convince the third party not to enter into a business relationship with the plaintiff."

*Intellisec v. Firecom, Inc.*, 2001 WL 218940, at *7 (E.D.N.Y. Feb. 1, 2001) (internal citations omitted); *see also Cardiocall, Inc. v. Serling and EKG Professionals, Inc.*, 492 F. Supp. 2d 139, 152 (E.D.N.Y. 2007) (holding that, to sustain a claim of tortious interference with prospective business relationships, "plaintiff must prove some conduct directed at the party with whom plaintiff has or seeks to have a business relationship; not merely conduct directed toward the plaintiff"); *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004) ("conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship"). Moreover, the dishonest, unfair or improper conduct demonstrated by the plaintiff must be sufficiently egregious to be "criminal or independently tortious." *Carvel*, 3 N.Y.3d at 190; *see also Valley Lane Industries Co. v. Voctoria's Secret Direct Brand management, L.L.C.,* 455 Fed. App'x. 102, 105-06 (2d Cir. 2012).

Plaintiff's claim of tortious interference fails for two reasons. First, plaintiff's claim is based on defendants' refusal to allow him to open his restaurant until he met certain conditions. Thus, plaintiff complains only about conduct by defendants directed at Stone himself and his business, Chef's Orchid, and not at any third parties – presumably customers or his landlord, Japan Airlines – with whom plaintiff sought to have business relationships.

Second, it hardly seems implausible or shocking that a restaurant where a fire took place would be closed for three or four weeks while Fire Code violations were remedied. The only evidence plaintiff relies on to establish that defendants acted dishonestly, unfairly, or improperly when they imposed conditions before he could reopen is the Malanga Report, prepared by his

expert, Robert Malanga, of Fire & Risk Engineering. Pl. Rule 56.1 ¶¶ 120-136. The report is insufficient to support plaintiff's claim in two respects. First, plaintiff has not submitted an affidavit or other sworn testimony from Malanga, and the facts and opinions in his report have therefore not been put before the Court in a form that would be admissible at trial. More importantly (in the sense that this first deficiency could presumably be easily remedied), the report simply does not contend that the defendants acted dishonestly or wrongfully or, as required by *Carvel*, committed a crime or independent tort. In fact, Malanga's report at least implicitly acknowledges that defendants observed genuine Fire Code violations when they responded to Chef's Orchid. For example, the report notes a large number of violations that were not resolved until November 10, 2010. Pl. Ex. A at 4-6. With respect to an inspection conducted on November 12, 2010, Malanga's report characterizes defendants' identification of a particular violation as "somewhat extreme" because of its long-standing nature, but does not identify any facts that would support a finding that defendants acted dishonestly or improperly. Pl. Ex. A at 9. With respect to yet another identified violation, Malanga's report notes that plaintiff arranged to have the defect repaired on December 15, 2010, *after* he was permitted to reopen. Pl. Ex. A at 8. Finally, although Malanga criticizes certain aspects of inspections conducted on December 2, 2010 and January 14, 2011, these criticisms are irrelevant to plaintiff's claims, as he was permitted to reopen after December 2, 2010. Malanga Report at 17 (noting that Seamon agreed on December 2, 2010 – less than four weeks after the fire – that the restaurant could operate with a Fire Watch).

Plaintiff also argues that defendants arbitrarily insisted he not reopen without permission from defendant Ryan. Pl. Opp. at 14. In this regard, plaintiff cites an email that Seamon sent to Ryan and others on November 10, 2010, two days after the fire, indicating, "The tenant was

instructed that the premise is to remain closed to occupancy until all health and fire hazards have been resolved, inspected by the Fire Marshal, and authorization to occupy received by the PA Health Inspector *and Lt. Ryan*." Pl. Ex. C, Docket Entry 50, page ID 903 (emphasis added). Whether or not it was proper to require Ryan's permission to reopen, plaintiff offers no evidence that he was otherwise ready to reopen but that Ryan improperly withheld permission for him to do so.

For all these reasons, defendants' motion for summary judgment on plaintiff's claim for tortious interference with prospective economic advantage is granted.

**Seventh Cause of Action: Negligent/Failure to Train and Supervise**

Plaintiff's seventh cause of action alleges that defendant Port Authority failed to properly train and supervise the defendant officers. According to plaintiff, the Port Authority knew or should have known of its officers' conduct and their "propensity to violate Plaintiff's civil rights." 2d Amend. Compl. ¶ 96. Stone alleges the Port Authority was negligent and/or failed to supervise, train, and control the officers in proper search and seizure procedures, the basis for probable cause, and Fire Code enforcement. 2d Amend. Compl. ¶¶ 97-99. Ryan, he argues, is also liable under this cause of action because he had policy-making authority and was a senior law enforcement official who failed to supervise his officers. 2d Amend. Compl. ¶¶ 101-106.

A local government may be liable under § 1983 when a violation of rights under federal law results from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978). Isolated acts by "non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of E.*

*Haven*, 691 F.3d 72, 81 (2d Cir. 2012) *cert. denied*, 134 S. Ct. 125, 187 L. Ed. 2d 255 (U.S. 2013).  However, such isolated acts may generate liability for the municipality if they were "done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses."  *Id.*

Another route to liability for local governments under § 1983, and one arguably more relevant here, is for inadequately training their employees.  Inadequate police training may be the basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  The Second Circuit has established three requirements for determining that a lack of training reflects deliberate indifference to individual rights.  First, the plaintiff must provide evidence that would allow a reasonable jury to determine "that a policy-maker knows to a moral certainty that her employees will confront a given situation."  *Green v. City of New York*, 465 F.3d 65, 80-81 (2d Cir. 2006) (internal references and quotations omitted).  Second, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."  *Id.*  And third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  *Id.*  One final requirement at the summary judgment stage is that the plaintiff must identify a "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  *Id.*

Stone is unable to support a claim for *Monell* liability based on Ryan's individual actions. He identifies no policy or custom that Ryan implemented and cites no evidence to suggest that Ryan had policy-making authority. Although Ryan may well have been "one of the highest ranking persons on the scene," this fact does not demonstrate that he made policy when he arrived at Chef's Orchid in response to the fire. Pl. Mem. at 20. Control of the scene on one occasion does not amount to authority to implement policy or develop custom and practice for the Port Authority, nor does Ryan's alleged authority to "request and order the Port Authority Emergency Service Unit to breach the door to Plaintiff's conference room." Pl. Mem. at 21; *see* Pl. R. 56.1 ¶ 29.

However, Stone's claim that the Port Authority failed to provide training on search and seizure is sufficiently supported to survive summary judgment. As discussed above, plaintiff's claim that defendants conducted an illegal search in violation of his Fourth Amendment rights survives defendants' summary judgment motion. There is no evidence that the individual defendants received any training on search and seizure from the Port Authority even though they did receive training with respect to other facets of law enforcement, such as the use of firearms. Moreover, at least two of the defendants expressed either a reluctance or an inability to articulate the requirements of the Fourth Amendment, or to describe the circumstances under which a warrantless search might be legal. Ryan, for example, was unable to answer even the most basic questions about what the Fourth Amendment provides. Ryan Dep. in particular at 91, 93 and generally at 81-95. Defendant Tucci, while stating that he received training from the Port Authority on firearms and differences between New York and New Jersey law, explicitly acknowledged that he never received training from the Port Authority regarding searches and seizures, probable cause or reasonable suspicion. Tucci Dep. at 16-19. Neither defendant

Seamon nor defendant Curnyn described having received any training in search and seizure law. Defendants did not produce in discovery or submit in support of their motion any training materials related to the Fourth Amendment, nor do they ever assert in their motion papers that such training was provided. *See* Pl. R. 56.1 ¶ 67; Pl. Opp. at 21-22.

The *Green* factors are satisfied here, at least sufficiently to overcome defendants' motion. Officials of the Port Authority knew or should have known that its law enforcement officers would be called upon to conduct lawful searches – and avoid conducting unlawful ones – when performing their duties. Training about the warrant requirement, and about when circumstances permit a warrantless search, would undoubtedly help officers who are required to make snap judgments in the field. Moreover, when an unlawful search is conducted, the result will almost inevitably be a violation of a person's Fourth Amendment rights. Finally, it is reasonable to infer that plaintiff's Fourth Amendment claim is closely related to the Port Authority's apparent failure to train. Accordingly, to the extent it is based on the Port Authority's failure to train its officers in search and seizure law, defendants' motion for summary judgment on plaintiff's seventh cause of action is denied.

**Eighth cause of action: violation of plaintiff's constitutional and state law rights**

Plaintiff's eighth cause of action asserts claims under 42 U.S.C. § 1983.[9]  In this cause of action, plaintiff asserts that he was deprived of his right to (1) freedom from excessive and unreasonable force; (2) freedom from summary punishment; (3) freedom from cruel and unusual punishment; (4) freedom from illegal search and seizure; (5) freedom from malicious prosecution; (6) freedom from false arrest and loss of liberty; (7) freedom from assault; (8) freedom from battery to his person; (9) interference with economic opportunity; (9) harassment,

---

[9] Plaintiff's complaint actually cites 28 U.S.C. § 1983.  2d Amend. Compl. ¶ 108.  The Court assumes the citation is in error and that plaintiff intended to refer to Title 42.

and (10) negligence.  There is no additional factual detail alleged in support of this cause of action.  2d Amend. Compl. ¶ 108.  These claims are duplicative of those asserted in plaintiff's first seven causes of action, addressed above.  Defendant's motion for summary judgment on this claim is therefore granted.

**Ninth Cause of Action:  Violation of Plaintiff's Rights to Due Process**

Plaintiff's ninth cause of action alleges a violation of due process.  The complaint provides little insight into the nature of plaintiff's due process claim, alleging only that defendants caused damage to Chef's Orchid by breaking down doors and "caus[ing] the Plaintiff to shut down his business and lose his business and property without due process under the law." 2d Amend. Compl. ¶¶ 110-12.  Plaintiff's memorandum further clarifies that plaintiff's ninth cause of action claims that defendants, by closing down his restaurant, deprived him of property without a meaningful opportunity to be heard or to challenge their action.  Pl. Mem. 14-15.

Plaintiff's business was occupied by the defendant officers from approximately 1:00 p.m. until about 9:00 p.m. on the date of the fire.  Stone Decl. ¶ 41; Pl. R. 56.1 ¶ 111.  The restaurant remained closed through December 2, 2010, or for approximately three and a half weeks after the fire, on which date the Authority indicated that the restaurant could reopen on the condition that a "Fire Watch" was provided.  Malanga Report at 12.

The Due Process Clause protects against deprivations of "constitutionally protected interests in life, liberty, or property . . . without due process of law."  *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 464-65 (2d Cir. 2006).  "Review of a procedural due process question involves two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Martine's Serv. Ctr., Inc. v.*

*Town of Wallkill*, 554 Fed. Appx. 32, 34 (2d Cir. 2014) (internal quotations and references omitted). When examining asserted procedural due process violations, courts distinguish between "(a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Id.* (citing *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.,* 101 F.3d 877, 880 (2d Cir. 1996)). If a deprivation is random and unauthorized, "due process requires only a post-deprivation proceeding." *Id.* (citing *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir. 2003)). However, "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process." *Hellenic,* 101 F.3d at 880.

Here, plaintiff's restaurant was closed by officers responding to a fire on the premises. As a result, the Port Authority was "not in a position to provide for predeprivation process." *Hellenic*, 101 F.3d at 880. Accordingly, only a post-deprivation hearing was required.

Such a hearing was available to plaintiff pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR").[10] The Second Circuit has "held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy . . . ." *Hellenic,* 101 F.3d at 881 (citing *Interboro Inst., Inc. v. Foley,* 985 F.2d 90, 93 (2d Cir. 1993); *McDarby v. Dinkins,* 907 F.2d 1334, 1338 (2d Cir. 1990); *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 888 (2d Cir. 1987) (noting that § 1983 "is not a means for litigating in a federal forum whether a state or local administrative decision was arbitrary or capricious"); *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir. 1984)). Such proceedings are "adequate for due process purposes even though the

---

[10] The New York CPLR provides Article 78 as "an amalgam of the common law writs of certiorari to review, mandamus, and prohibition, [which] provides both a hearing and a means of redress for petitioners." *Hellenic*, 101 F.3d at 881. A proceeding brought pursuant to Article 78 may challenge a determination by a body or officer as "made in violation of lawful procedure," having been "affected by an error of law," or as "arbitrary and capricious and an abuse of discretion." NY CPLR § 7803(3).

petitioner may not be able to recover the same relief that he could in a § 1983 suit." *Hellenic*, 101 F.3d at 881 (citing *Hudson v. Palmer,* 468 U.S. 517, 535 (1984)).

Because Stone could have challenged the defendants' closing of his business in a proceeding brought pursuant to CPLR Article 78, he was not denied a meaningful opportunity to be heard. Defendants' motion for summary judgment with respect to plaintiff's ninth cause of action is therefore granted.

**Tenth Cause of Action: Negligence**

Plaintiff's tenth and final cause of action alleges that the defendants were negligent in shutting down his restaurant and that they had a "duty to perform accurate inspections and to not improperly and unlawfully close Plaintiff's business." 2d Amend. Compl. ¶¶ 114-18. Defendants argue that this claim is duplicative of earlier claims and should be dismissed. Defs. Mem. at 18-19.

Plaintiff does not defend this cause of action in his motion papers. Although his memorandum of law in opposition to summary judgment includes a topic heading stating that "Defendants do not contest that they illegally and negligently shut down Plaintiff's business," the text does not include any argument or cite any evidence with respect to plaintiff's negligence claim. Pl. Opp. at 12. Accordingly, defendants' motion for summary judgment with respect to plaintiff's tenth cause of action is granted.

**Default**

On July 26, 2011, Stone filed a complaint naming the Port Authority and Ryan as defendants. Docket Entry 1. On November 8, 2011, he filed an amended complaint again naming the Port Authority and Ryan as the sole defendants. Docket Entry 4. On May 30 2013, Stone filed a Second Amended complaint naming the Port Authority, Ryan, Seamon, Tucci, and

Curnyn.  Docket Entry 32.  Plaintiffs have moved for a certificate of default against Defendants Scott Seamon, John Tucci, and John Curnyn for their alleged failure to timely submit an answer or otherwise move against the complaint.  Docket Entry 59.  Defendants argue that Defendant Port Authority and John Ryan answered the Amended Complaint, which named only them.  The Port Authority and Defendant Ryan filed an answer to the Second Amended Compliant on June 19, 2013, Docket Entry 33, and point out that, on August 16, 2013, they filed moving papers in support of their motion for summary judgment seeking dismissal of the Second Amended Complaint.  Defs. Objection to Plaintiff's Request for a Certificate of Default, Docket Entry 61.

The law favors dispositions on the merits.  Assuming defendants Seamon, Curnyn and Tucci have now been served, they may have until August 1, 2014 to file an answer to the remaining claims in the Second Amended Complaint.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied with respect to plaintiff's second cause of action for unlawful search and seizure, insofar as plaintiff complains about the search of his office, conference room and closed or locked cabinets, and with respect to plaintiff's seventh cause of action, insofar as plaintiff alleges that the individual defendants did not receive adequate training from the Port Authority with respect to search and seizure law.  In all other respects, defendants' motion for summary judgment is granted.

SO ORDERED.

_____/s/_____
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
July 8, 2014

*U:\CG 2013-2014\Stone v. Port Authority 11-CV-03932\Stone Summary Judgment Final.docx*